# CHARLESTON

## Isner v. Nydegger.

Submitted June 17, 1907.   Decided February 25, 1908.

1. CONTRACTS—*Rescission—Reformation—Grounds.*
   The rights of rescission and reformation of contracts are analogous. Both are predicated on fraud, accident or mistake. (p. 682.)

2.  SAME—*Evidence.*

Such right is an independent equity, to be established, not a mere additional term or condition of the written instrument, and the legal presumption that the instrument correctly expresses the intention of the parties must be overcome by clear and satisfactory proof. (p. 682.)

3.  APPEAL—*Review—Cancellation of Instruments—Deed—Evidence.*

A decree rescinding a deed, at the instance of the grantee, though predicated on the finding of the trial court on an issue of fact, will be reversed if the contract, as expressed in the deed, gives the grantee all the grantor could reasonably and consistently have conveyed, under the circumstances existing at the date of the execution thereof, and the oral evidence, respecting his alleged intention to grant more, does not preponderate in favor of either party. (p. 683.)

Appeal from Circuit Court, Randolph County.

Bill by Moses Isner against John F. Nydegger. Decree for defendant, and plaintiff appeals.

*Reversed.    Remanded.*

W. B. MAXWELL, for appellant.

SAMUEL T. SPEARS, for appellee.

POFFENBARGER, PRESIDENT:

Moses Isner, the owner of a tract of land in Randolph county, lying on Cheat River, at a place called Falkner Station, on the Coal & Iron Railroad, a portion of which, containing 24.38 acres, is level and lies between the railroad and the river, while the residue lies principally on higher ground back of the railroad, conveyed said 24.38 acres to John F. Nydegger, by a deed dated October 8, 1904, for and in consideration of $1,500.00, of which $100.00 was paid in cash and the balance of which was to be paid as follows: $100.00 on or before October 15, 1904, $300.00 on or before January 1, 1905 and the residue in two equal payments of $500.00 each on or before January 1, 1906, and January 1, 1907, respectively, for all of which deferred payments notes were executed and a vendor's lien reserved. Nydegger paid the first two payments and was in default as to the third, when this suit was brought to enforce the lien. He answered the bill, setting up, as a defense and ground for affirmative relief, an alleged

mistake in the deed, and prayed, a rescission of the contract, and, alternatively an abatement of purchase money, if he could not have the contract rescinded.    On the hearing, the court sustained his contention and rendered a decree from which Isner has appealed.

The ground of defense and basis for affirmative relief set up in the answer is the alleged omission from the deed of certain water rights which the defendant claims it was agreed that he should have. On the residue of the plaintiff's land, there were certain springs, some distance back from the railroad near a small stream, known as Spring Run, and on a ravine emptying into it, one of which was known as the Falling Spring.    Below and connected with it there is another distant about thirty feet.    These are about one hundred feet above the level of the railroad.    From the lower spring, the water sinks into the ground, apparently forming a subterranean stream.    About two hundred feet from it,  water is available either from an  underground  stream, emanating from these springs, or from another underground source. From this point a three inch pipe had been laid to the water . station of the railroad company, under a grant made by Isner to the railroad company sometime before he conveyed to Nydegger.    The defendant claims it was agreed between him and the plaintiff that he should have water from this source of supply, sufficient in quantity for the purposes he had in view in buying the land, it being suitable for gardening purposes, and he having intended to irrigate it with water from these springs and use it for gardening and poultry purposes. Though he knew at the time of his purchase the railroad company had its pipe laid and was using the water, he says he did not know, and the plaintiff did not inform him, that the railroad company had a deed from the plaintiff conveying to it a perpetual right of use of the water.    The deed in question here contains the following clause relating to a water right:    " The parties of the first part hereby further grant and convey unto the party of the second part the right to construct and maintain a water line over and through other property owned by them from a point at or near the Falling Springs at the property hereby conveyed with the understanding that the party of the first part shall have the right to tap said water line at or near his residence for the pur-

pose of furnishing water for his family." The deed to the railroad company contains this clause: "The parties of the first part further grant to the party of the second part perpetual right of way through their said land by the most convenient route for a pipe line to the large spring or spring run on the land of the parties of the first part and the perpetual right to use said water for any purpose it may desire, and to convey same through said pipe line to the said strip of ground herein conveyed for any purpose." The strip of ground referred to was the railroad right of way conveyed by the same deed.

The branch known as Spring Run, from which the railroad company obtains its supply of water, is a line between Isner's land and the Wees land. Isner testifies that, in his opinion, the water obtained by the railroad company comes into Spring Run from the Wees land. He says there is a swamp near the point at which the company's pipe begins, formed by water coming, as he thinks, from the Falling Springs, but this opinion of his is not accepted by others. There is a difference of opinion among the witnesses as to the source of the water obtained by the railroad company and also as to the sufficiency of the supply for its purposes; some of them asserting that, in dry weather, it is insufficient, while others think it is more than sufficient at all times. The testimony of both parties is in agreement to the fact that before the defendant purchased, they went over the land and up to the springs and also that the defendant knew the railroad company was obtaining its supply of water therefrom. Isner does not say he told Nydegger he had conveyed to the railroad company a perpetual right of use of water, but does say he informed him that it had the right to use the water, and that it was agreed between them that there was sufficient water for both the railroad company and Nydegger. Creed Isner, a brother of the plaintiff, says he heard a conversation between them in his store, before the deed was made, from which he got the impression that they had already agreed upon the sale and in which plaintiff said he could not, or would not do anything to conflict with the railroad company's right and Nydegger remarked that there would be more than enough water for both and that he did not want more than a two inch pipe. James

Calain says he heard a conversation between them in the same store in which Nydegger said two pipe lines would not amount to anything to those springs, that a two inch pipe would afford all the water he wanted and that it would not interfere with the railroad company. Wirt Isner, a son of the plaintiff, says he heard a conversation similar to that related by his father. The wife of the plaintiff says she heard a conversation between the parties in which her husband said he would not sell any right of way for water or anything else that belonged to the railroad company and Mr. Nydegger said it would not interfere and that there was plenty of water for both him and the railroad company. On the contrary, the defendant says the plaintiff told him the railroad company was using water for their tank, that he had not conveyed the same to them and that there was sufficient water there for all purposes. His bookkeeper, W. K. Harper, says Isner told Nydegger he could have all the water he wanted, from which he inferred the defendant was to have all the water; that the railroad company right was mentioned and that Isner told the defendant there was plenty of water there and he had not objected to the railroad company using it; and that there was a large spring there and defendant could shut the railroad company off from it if he wanted to. W. E. Baker, who drafted the deed, says he understood from the parties, when they came to him to have it prepared, that the defendant was to have any or all the water he might desire from the spring and that the latter declared at the time his intention to use the property for gardening and poultry purposes. He says further he had been under the impression that the clause in the deed above quoted contained a grant of the water right and says it must have been omitted by the stenographer in transcribing her notes. He promised to ascertain whether this was true or not and come back and testify from the notes, but did not do so. On cross-examination, he said he could not say positively that his dictation had not been taken by his typist on the machine instead of in stenographic notes, but thought it had been taken in shorthand.

Since the right of rescission is always based upon fraud, accident or mistake, it is analogous to the right of reformation. Both are predicated upon the same ground. Neither

involves a mere controversy as to what a contract is or was. A right of rescission, cancellation or reformation is more than a dispute of that kind. The written contract, deed or other instrument is a fact, a memorial of a transaction or agreement solemnly admitted to have occurred or to have been entered into. Presumptively it is what the parties intended. A right of rescission, impeachment or reformation is an equity established independently of that instrument. The creation thereof amounts to an establishment of an extrinsic fact or right, in some sense independent of the instrument to which it relates. Hence, he who attempts to set it up assumes the burden of proof, and, because of the solemnity and importance which the law attaches to a written instrument, he must make his right appear by the clearest and most satisfactory evidence. "A mistake in the execution of writing will not, in equity, be corrected, unless it appears that it does not contain the intention of the parties at the time it was made; and the proof of this, either parol, written, or both, must not be loose, equivocal, or contradictory, or in its texture open to reasonable doubt or opposing presumptions, for the writing itself is regarded as evidence so strong that only other unequivocal evidence irresistibly conclusive is sufficient to reform it." *Jarrell* v. *Jarrell*, 27 W. Va. 743. To the same effect see *Koen* v. *Kerns*, 47 W. Va. 575; *Robinson* v. *Braiden*, 44 W. Va. 183. "Before a court of chancery will consent to correct a mistake in the terms of a deed, participated in by only one of the parties thereto, where no fraud or deception is practiced, and where a party of ordinary intelligence, who can read, has deliberately executed said deed, the proof of mistake, where admitted at all, must be strong, clear, preponderating and convincing to the mind of the Court. *Pennybacker* v. *Laidley*, 33 W. Va, 624; *Straley* v. *Perdue*, 33 W. Va. 375.

The grant of a right of way to lay and maintain a water pipe on the plaintiff's property from a point at or near a certain spring on that property might ordinarily be regarded as a circumstance tending to sustain the contention of the defendant and irreconcilable with the testimony of the plaintiff to the contrary; for the construction of such a pipe line without the right to use water from the spring would be

a useless and vain act.   But the force of this circumstance is
broken by the conditions existing at the time and known
to the defendant.   He had been over the property and knew
the railroad company relied upon that spring as the source of
its supply of water for its tank.   He saw its pipe line and
admits that it was a subject of conversation during the nego-
tiations.   This argues that he wanted the land and desired
the water also, but was willing to take his chances on the
sufficency of the supply of water for himself and the rail-
road company, in view of which there would be no objec-
tion on the part of the railroad company to his using it, or
his ability to secure the consent of the railroad company to
his using it.   The deed itself is consistent with this view
and in harmony with the conditions under which it was
made.   The grantor in that deed knew he had conveyed all
of the water necessary for the purposes of the railroad com-
pany, and it is not to be lightly supposed that he intended
to make another grant of the same thing, in a deed con-
taining a covenant of general warranty, on which he would
be liable; or to make a deed or contract that could be
avoided on the ground of his prior conveyance to a third
party of a material part of the subject matter thereof.
These circumtances and facts, well known to the grantor,
constitute very strong reasons for his not having granted
the right in question, and they are such as might well have
induced the defendant to take in this deed all that the plain-
tiff could give him, with a view to obtaining something
further from the railroad company.   Against this reasonable
conclusion, deducible from the undisputed facts, there is no
preponderance of the oral testimony in favor of the defend-
ant.   Hence, he has clearly fallen far short of the require-
ments of the rule governing such cases.

Our conclusion, therefore, is that the court erred in de-
creeing a rescission of the contract and re-conveyance of the
land.   The decree will be reversed and the cause remanded
with directions to ascertain the amount of purchase money
due, render a decree for the same, and, on failure of payment
thereof within a reasonable time to be fixed by the
court, order the land to be sold for the satisfaction of the
lien.

*Reversed.   Remanded.*